Filed 10/28/22  P. v. Pineda CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>LUIS ALBERTO PINEDA,<br><br>     Defendant and Appellant. | F080762<br><br>(Kern Super. Ct. No. BF171001A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

David L. Annicchiarico, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant and defendant Luis Alberto Pineda was convicted by a jury of first degree murder arising out of a shooting in the parking lot of a sports bar.  The trial court sentenced defendant to an aggregate indeterminate term of 50 years to life.  On appeal,

defendant contends reversal is required due to prejudicial instructional errors. The alleged instructional errors include (1) an instruction prohibiting a conviction based solely on defendant's out-of-court statements; (2) a failure to instruct that accomplice testimony should be viewed with distrust; (3) an instruction prohibiting speculation on whether other persons have been or will be prosecuted; and (4) an instruction on inferring consciousness of guilt from defendant's immediate flight after the crime was committed. Rejecting these claims, we affirm.

## FACTUAL BACKGROUND

### Prosecution Evidence

On January 21, 2018, a fistfight broke out in the parking lot of the Red Zone, a bar in Bakersfield, at approximately 1:45 a.m. Patrons of the bar were walking out at closing time when a loud argument spilled into the parking lot. Christopher Rodriguez, a security guard that patrons recognized from a different bar, was involved in a one-on-one fistfight with another person. A conflict started between Rodriguez and others in the Red Zone after he cut in a line of approximately 10 men to use the restroom. The fight ended once Rodriguez was on top of the other person and the two were separated. Rodriguez and the person he had been fighting with continued to "badmouth" one another after the fight was finished.

Rodriguez was then approached by another person, who was later identified as defendant. Defendant and Rodriguez began yelling at each other. As defendant started walking away, he told Rodriguez, " 'If you don't shut the "F" up, I'm going to come back,' " and "pop your ass if that's what you want." A few minutes later, defendant drove through the parking lot in his Jeep Commander, pulled up near Rodriguez, and stepped out of the driver's side door. Defendant fired seven rounds from a .40-caliber firearm, and Rodriguez was hit with five of the rounds in the shoulder, side, back, and thigh as he attempted to run away. Defendant returned to his car and drove home after firing the shots.

2.

Leonel Ramirez, a friend of defendant, rode in defendant's Jeep from Red Zone to defendant's home in Lamont. Another one of defendant's friends, Carlos Santiago Baca, heard gunshots when he was walking to his car in a different section of the parking lot. Baca drove in his own car from Red Zone to defendant's home. Defendant and Ramirez were at the home when he arrived. Defendant placed the firearm in the front passenger seat of the Jeep. Baca picked up the firearm from the front seat to check for safety while defendant went inside. Baca panicked as law enforcement officers arrived, and he tossed the firearm over the fence. An officer recovered a .40-caliber handgun in the flower bed of defendant's home. The magazine from the firearm was found in the front passenger seat of defendant's Jeep.

Ramirez and Baca complied with the officers' demands to stop and put their hands in the air. Defendant initially ignored the officers' commands before coming to a stop near a truck in his driveway. Officers handcuffed and secured defendant, Ramirez, and Baca. An eyewitness to the murder, Jose Orozco, was brought to the scene by officers to conduct an infield show up. Orozco identified defendant as the shooter from the Red Zone based upon defendant's neck tattoo, clothing, and glasses. Orozco recognized Ramirez from the Red Zone, but he did not witness any involvement by Ramirez in the shooting. Baca was not recognized by Orozco.

Later that same morning, officers contacted three persons who were present during the shooting, Melissa Toledo, Dyllan Narvaez, and Frankee Barrios, at a residence. An officer conducted a photographic lineup for Toledo and Narvaez, but Barrios was not shown a photo lineup because he did not observe the shooting. Toledo selected two photographs when asked by officers to identify the shooter, and one of the photographs was defendant. However, Toledo chose the photograph of the other man when required to identify only one photograph as the shooter. Narvaez identified defendant after narrowing his options to two photographs. Narvaez chose defendant over the other man based upon defendant's lighter complexion and face shape.

3.

Ramirez was interviewed at the police station by detectives with the Bakersfield Police Department on the date of his arrest. Ramirez initially denied having knowledge of any fighting at the Red Zone, and he claimed that his girlfriend dropped him off at defendant's home. Ramirez also claimed he did not know defendant's name, despite admitting that they grew up together. He also appeared to suggest that there was a fourth person present beside defendant, Baca, and himself when the police arrived.

After the homicide detectives explained the concept of being charged with an accessory to murder and the importance of being honest, Ramirez began to acknowledge that defendant was involved in a fight at the Red Zone. He told the detectives that he was urinating by a dumpster in the parking lot when he heard gunshots. Ramirez then hopped into the backseat of defendant's car and rode back to defendant's home. He continued to suggest that another friend of defendant's (name unknown) was sitting in the front seat. Ramirez believed defendant was shooting from inside the car, and he confirmed that it sounded like the gunshots came from defendant's Jeep.

A forensic analysis of the firearm, magazine, and shell casings was unable to exclude defendant as a potential contributor to the DNA profile of the items. Ramirez and Baca were excluded as DNA contributors on the casings and magazine, but no conclusion could be reached regarding the firearm due to a lack of statistical support. The magazine seized from the front passenger seat of the Jeep had Ramirez's fingerprints on it.

*Defense Evidence*

Raul Rodriguez, a friend of the victim, was interviewed by Officer David Hamma in the parking lot of the Red Zone shortly after the shooting.[1] Raul described the shooter as a Hispanic male, 27 to 28 years old, light complected, dark hair, heavyset, six feet two inches tall, and weighing 245 pounds. He also explained that the shooter had a white

---

[1] Officer Hamma's interview of Raul was recorded and played for the jury.

shirt, glasses, spiked hair, and tattoos on his arm. One of the tattoos on his arm said "Colonia Bakers." Raul claimed he saw defendant at the Red Zone frequently, and he recognized a person in the group with the shooter as a Colonia Bakers member. The gang member ran away on foot after the shooting. Raul heard the shooter yell the Spanish letters "ce be" before shooting Rodriguez, which is a reference to the Colonia Bakers gang. He told the officer that the shooter took off after getting into the passenger seat of a black "2009 Nissan Altima" that was driven by a woman.

Raul indicated he would be able to identify the shooter if he saw him again. Raul would later testify that he did not remember anything that he said to the police officer on the night of the shooting, and he would no longer be able to identify the shooter because he could not remember. He invoked his Fifth Amendment right in response to certain questions because his probation terms prevented him from being present at places where alcohol was served. Raul denied telling a defense investigator that defendant was not the shooter, and he insisted that he told the investigator that he could not remember. The defense investigator testified that Raul said he did not recognize defendant, Ramirez, and Baca when the investigator showed Raul photographs of them.

### Rebuttal Evidence

Surveillance footage from a business near the Red Zone showed a vehicle driving through the Red Zone parking lot and coming to a stop close to the location where shell casings were found. Detective James Jones found the details of the vehicle to be consistent with defendant's Jeep Commander, however the quality of the video made it difficult to identify both people and vehicles. A person in light colored clothing could be seen running to the Jeep before disappearing, but the person could not be identified by the video. Detective Jones did not follow up with Raul because he was described as an uncooperative witness at the scene of the shooting.

PROCEDURAL BACKGROUND

On September 21, 2018, an information was filed in the Superior Court of Kern County charging defendant with count 1, first degree, premeditated murder (Pen. Code, § 187, subd. (a)),[2] with the special allegation that he personally discharged a firearm causing death (§ 12022.53, subd. (d)). On October 31, 2019, defendant's jury trial began. The jury found defendant guilty of first degree murder on November 20, 2019. The jury also found the special allegation that he discharged a firearm causing death to be true.

On February 4, 2020, the court sentenced defendant to an aggregate indeterminate term of 50 years to life in prison, including 25 years to life on count 1, first degree murder, plus an additional 25 years to life for the firearm enhancement. Defendant filed a timely notice of appeal on the same day.

## DISCUSSION

### I. Instruction on Defendant's Statement Alone (CALCRIM No. 359)

Defendant contends the trial court erred by instructing the jury on the corpus delicti rule. Defendant argues that the instruction was not applicable because the extrajudicial statement attributed to defendant constituted part of the crime. He also argues the instruction confused the jury on the issue of identity, diminished his identity defense, and reduced the prosecution's burden.

#### A. *Background*

Defendant made out-of-court statements that were part of the prosecution's case. Multiple witnesses testified that prior to the shooting they heard defendant tell the victim something to the effect that defendant would return to "pop [the victim's] ass" if he didn't "shut the 'F' up." The trial court instructed the jury pursuant to a modified version of CALCRIM No. 358 and an unmodified CALCRIM No. 359. Defendant's trial counsel objected to the CALCRIM No. 359 instruction, and he argued that the instruction

---

[2] All further statutory references are to the Penal Code unless otherwise stated.

lowered the prosecution's burden of proof by suggesting that slight evidence could be used to corroborate any out-of-court statements made by defendant. The prosecution responded that the last line of the instruction reminds the jury that they may not convict unless the prosecution proved defendant's guilt beyond a reasonable doubt.

The jury was instructed with a modified CALCRIM No. 358 instruction as follows:

> "You have heard evidence that the defendant may have made an oral statement before the trial. You must decide whether the defendant made any such statement, in whole or in part. If you decide that the defendant made such a statement, consider the statement, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement."

The trial court then gave the jury CALCRIM No. 359 instruction as follows:

> "The defendant may not be convicted of any crime based on his out-of-court statement alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime or lesser included offense was committed. That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. This requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime. If other evidence shows that the charged crime or a lesser offense was committed, the identity of the person who committed it and the degree of the crime may be proved by the defendant's statement alone. You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

**B.** *Applicable Law*

In reviewing the claim that the given instruction lowered the standard of proof, we consider whether there is a reasonable likelihood the jury misapplied the instruction. (*Victor v. Nebraska* (1994) 511 U.S. 1, 6.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v.*

7.

*Jablonski* (2006) 37 Cal.4th 774, 831.)  In other words, we cannot view a single instruction "in 'artificial isolation'; instead, it must be evaluated 'in the context of the overall charge.' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 823–824.)  We also consider counsels' arguments in assessing the probable impact of the instruction on the jury (*People v. Young* (2005) 34 Cal.4th 1149, 1202), and we assume jurors are intelligent persons capable of understanding and correlating all of the instructions given (*People v. Mills* (1991) 1 Cal.App.4th 898, 918).

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself – i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.  In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant.  [Citations.]  Though mandated by no statute, and never deemed a constitutional guaranty, the rule requiring some independent proof of the corpus delicti has roots in the common law." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 (*Alvarez*).)  "This rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Id.* at p. 1169.)

The identity of the defendant as the perpetrator of the crime, however, is not part of the corpus delicti.  Identity may be established by the defendant's words alone. (*People v. Frye* (1998) 18 Cal.4th 894, 960, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)  When a defendant's statements form part of the prosecution's case, the trial court must instruct sua sponte that a finding of guilt cannot be predicated on the statements alone. (*Alvarez*, *supra*, 27 Cal.4th at p. 1170.)  The corpus delicti rule is defined in the CALCRIM No. 359 instruction and its predecessor, CALJIC No. 2.72. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1258–1259 (*Rosales*).)

The corpus delicti rule has been extended "to preoffense statements of later intent as well as to postoffense admissions and confessions [citation], but not to a statement that is *part of the crime itself.*" (*People v. Carpenter* (1997) 15 Cal.4th 312, 394 (*Carpenter*).) In *Carpenter*, the defendant came upon a couple hiking in a remote area. (*Id.* at p. 345.) He held them at gunpoint, told them to do what he said, and told the woman he wanted to rape her. (*Ibid.*) He subsequently shot both of them. He was convicted of the murder and attempted rape of the woman and the attempted murder of the man. (*Id.* at p. 344.) The court concluded the defendant's statement that he wanted to rape the woman was not an extrajudicial inculpatory statement that could not be used to prove commission of the crime without first independently establishing the corpus delicti. (*Id.* at p. 394.) Rather, "[a] statement to the victim of current intent can itself supply the corpus delicti." (*Ibid.*) The corpus delicti rule was designed to provide independent evidence that the crime occurred. The principal reason for the rule is to ensure " 'that the accused is not admitting to a crime that never occurred.' " (*Ibid.*) The defendant's statement to the victim of his then-current intent "was part of the crime; it could not be a confession to a crime that never occurred. That statement of intent did not have to be independently proved." (*Ibid.*) Consistent with that decision, the bench notes for CALCRIM No. 359 state: "The corpus delicti cannot be proved by statements made before or after the crime, but can be proved by statements made during the crime."

In *People v. Chan* (2005) 128 Cal.App.4th 408, Division Five of Second District Court of Appeal followed *Carpenter* in finding the corpus delicti rule "has no application when the defendant's extrajudicial statements constitute the crime" and "does not extend to statements made during the commission of the charged crime." (*Chan*, at p. 420.) In *Chan* the defendant was convicted of failing to register as a sex offender because he had provided false addresses when registering. (*Id.* at pp. 413, 414–415.) "The extrajudicial statements at issue … [were] defendant's own false written entries on … convicted sex offender registration forms, i.e., the crime itself." (*Id.* at pp. 420–421.)

Relying on this same exception to the corpus delicti rule, the court in *In re I.M.* (2005) 125 Cal.App.4th 1195 found the defendant's misleading statement to the police was intended to aid the principal to the crime and thus was part of the crime of being an accessory after the fact of murder: "It is true that the evidence of defendant's attempt to mislead police is in the form of a statement made by him to the investigating officers. Defendant's statement, however, was not a description of the corpus delicti. As an attempt to mislead, the statement *itself* was a part of the corpus delicti. Statements that, although extrajudicial, are themselves a part of the conduct of the crime, are not subject to the corpus delicti rule. [Citation.] Defendant's attempt to mislead police, therefore, can be used to establish the corpus delicti of his crime." (*Id*. at pp. 1203–1204.)

## C. *Analysis*

Defendant contends that CALCRIM No. 359 was not applicable to the present case because the statement that defendant would "come back and "pop [the victim's] ass" if the victim did not "shut the 'F' up" was part of the offense itself in reliance on *Carpenter*, *supra*, 15 Cal.4th 312. Defendant argues that the statement attributed to him is "just like the *Carpenter* defendant's statement that he intended to rape the victim."

We find *Carpenter* and its progeny distinguishable from the present case in that defendant's conditional statement that he would return and shoot the victim in the event the victim did not stop talking was a preoffense statement of later intent as opposed to part of the crime of murder itself. In *Carpenter*, the trial court's refusal to give the corpus delicti instruction was proper because the defendant's statement that he wanted to rape a murder victim was a statement of present intent to commit rape. (*Carpenter*, *supra*, 15 Cal. 4th at pp. 393–394.) The defendant was convicted of attempted rape of the murder victim, however, the evidence indicated that the defendant shot her prior to committing the act of rape. (*Id*. at pp. 345–346.) Therefore, the *Carpenter* defendant's statement that he wanted to rape the murder victim was a statement of present intent, which comprised the evidence of his intent for the attempted rape conviction.

10.

Here, the statement at issue was made by defendant during a verbal exchange with the victim prior to the shooting. Although the defendant returned moments later to shoot the victim, the statement itself did not comprise part of the offense of murder. Instead, defendant's threat to return and shoot the victim if he did not stop talking reflected his intent to come back later with a weapon and shoot the victim. Defendant's statement was a conditional threat, and such a statement of later intent could not be used to prove the corpus delicti of the murder offense without requiring other independent evidence. Defendant is correct that there was no dispute that a murder occurred. However, the prosecution was still required to prove that defendant was the person who committed the murder without relying solely on testimony that he made an earlier threat to shoot the victim. Accordingly, the instruction on corpus delicti was applicable in the matter, and the trial court was required to instruct the jury in relation to defendant's preoffense statement of later intent.

Next, citing to the Sixth District Court of Appeal's decision in *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*), defendant argues the instruction confused the jury on the issue of identity, diminished his identity defense, and reduced the prosecution's burden. We disagree.

The trial court in *Rivas* instructed the jury with an earlier version of CALCRIM No. 359 that stated in the third paragraph, " 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' " (*Rivas*, *supra*, 214 Cal.App.4th at p. 1428, fn. 5.) The *Rivas* court held this "identity" paragraph "requires reconsideration" because it "presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime – and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' [citation], which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party." (*Id*. at p. 1429, fn.

11.

omitted.)  In so concluding, the *Rivas* court distinguished this "identity" wording as "quite different" from the instruction our Supreme Court upheld in *People v. Foster* (2010) 50 Cal.4th 1301.  (*Rivas*, *supra*, at p. 1429, fn. 8.)  The jury in *Foster* was instructed that " '[t]he identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime.  Such identity or degree of the crime may be established by an admission.' "  (*People v. Foster*, at p. 1344, fn. 19, italics omitted.)

In *Rosales*, *supra*, 222 Cal.App.4th 1254, Division Five of the Second District Court of Appeal disagreed with *Rivas* and held the "identity" language in former CALCRIM No. 359 correctly stated the law and created no reasonable likelihood of juror confusion.  (*Rosales*, at pp. 1260–1261.)  We need not take sides on the matter because the trial court here instructed the jury with a different version of CALCRIM No. 359 than was used in those cases – a version that was revised in response to *Rivas*.  (Judicial Council of Cal., Crim. Jury Instns. (2015) Bench Notes to CALCRIM No. 359, p. 126.)  This version correctly states the law and is more akin to the instruction our Supreme Court upheld in *Foster* than to the earlier revision of CALCRIM No. 359 questioned in *Rivas* and upheld in *Rosales*.

We likewise reject defendant's contention that CALCRIM No. 359 "lessened the prosecutor's burden of proof."  The *Rivas* court rejected a similar challenge, explaining "the jury was told not to return any convictions that were not supported to its satisfaction by proof beyond a reasonable doubt."  (*Rivas*, *supra*, 214 Cal.App.4th at p. 1431.)  The challenged portion of the instruction merely constitutes a statement that the corpus delicti rule does not preclude reliance on the defendant's out-of-court statements to prove identity beyond a reasonable doubt.  Additionally, the court instructed with CALCRIM No. 220.  CALCRIM No. 220 defines reasonable doubt, informs the jury that it must consider all the evidence and instructs that the jury that defendant is entitled to an

acquittal unless the evidence proves him guilty beyond a reasonable doubt. We presume the jury followed these instructions. (See *People v. Smith* (2007) 40 Cal.4th 483, 517.)

We conclude that defendant's challenge fails because reasonable jurors would have understood from the entirety of the jury charge that the People were required to prove identity beyond a reasonable doubt after examination of all the evidence. There is no reasonable likelihood the jury construed the corpus delicti instruction in a manner that violated defendant's rights, and we need not reach his prejudice argument. (*People v. Rogers* (2006) 39 Cal.4th 826, 872.) Accordingly, we conclude the trial court properly instructed the jury regarding the law and did so in a way that was not likely to confuse jurors.

## II. Lack of Accomplice Testimony Instruction (CALCRIM No. 334)

Defendant also argues that the trial court's failure to give accomplice instructions requires reversal of the judgment. The People argue there was insufficient evidence to conclude that Ramirez or Baca were accomplices, and, therefore, the instruction was not required.

### A. *Background*

It does not appear from the record that accomplice instructions were a topic of discussion in the trial court. No party requested the instruction, and the trial court did not raise the issue.

Baca, Ramirez, and defendant grew up together as friends, and they were all present at Red Zone on the night of the shooting. Baca testified that the three of them planned to go to defendant's home after the bar closed. As the bar was closing, Baca and Ramirez observed a fight in the parking lot as they were exiting. Baca observed defendant in his vehicle, and Ramirez walked toward defendant's vehicle while Baca walked to his own vehicle. Once Baca was a few feet from his own vehicle, he heard gunshots and quickly left the parking lot.

Defendant and Ramirez were already at defendant's home when Baca arrived. Baca observed defendant put a firearm on the front passenger seat of the defendant's vehicle. Baca admitted to picking up the firearm to check for safety purposes, and he threw the gun into the yard once police officers arrived. Baca acknowledged that he changed his original statement to homicide detectives after they informed him of the possibility that he could be charged as an accessory to murder.

At trial, Ramirez testified that he was "pretty drunk" on the night of the shooting, and he denied remembering the various statements he made to police officers about what he observed leading up to the shooting. Ramirez claimed he could not remember seeing a fight in the parking lot, but he acknowledged that he heard a gunshot while he was using the restroom near a dumpster. Ramirez rode in defendant's vehicle from the Red Zone to defendant's home. Police officers responded to defendant's home about 10 minutes later, but Ramirez claimed no one went inside the defendant's home before the officers arrived. Ramirez testified that he did not try to protect defendant when he was providing his statement to the homicide detectives. However, Ramirez's story gradually changed once the detectives brought up the possibility of a charge for accessory to murder.

B.      *Applicable Law*

Section 1111 defines an accomplice "as one who is liable to prosecution for the identical offense charged against the defendant …." The section further provides: "A conviction cannot be had upon the testimony of an accomplice unless it can be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (*Ibid*.) An accessory, however, is not liable to prosecution for the identical offense, and so is not an accomplice." (*People v. Fauber* (1992) 2 Cal.4th 792, 833–834, fn. omitted.) "[W]hen an accomplice is called to testify on behalf of the prosecution, the court must instruct the jurors that

accomplice testimony should be viewed with distrust." (*People v. Guiuan* (1998) 18 Cal.4th 558, 565.)

"Only when there is 'substantial evidence that a witness who has implicated the defendant was an accomplice' must the trial court instruct on 'the principles regarding accomplice testimony.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1155.) "Substantial evidence is 'evidence sufficient to "deserve consideration by the jury," not "whenever *any* evidence is presented, no matter how weak." ' " (*People v. Lewis* (2001) 26 Cal.4th 334, 369.) " " '[I]f the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony." ' " (*People v. Johnsen*, 10 Cal.5th at p. 1155.)

In a criminal case, a trial court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) Instruction is required for those legal principles " 'closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*Ibid*.) We review de novo a claim that a trial court failed to give a required jury instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

### C.    *Analysis*

There was no evidence that Baca or Ramirez directly participated in the murder of Rodriguez, nor was there any evidence that they advised or encouraged its commission. The undisputed evidence established that Baca handled the firearm after the shooting, and Ramirez left the scene of the shooting in defendant's vehicle. The conduct of Baca and Ramirez after Rodriguez's murder may have implicated them as accessories after the fact, but their conduct would not subject them to accomplice liability for murder.

A witness's "assistance in disposing of evidence of the various crimes makes him, at most, an accessory after the fact; a mere accessory is not an accomplice." (*People v. Balderas* (1985) 41 Cal.3d 144, 193, fn. omitted.) The California Supreme Court's

decision in *People v. Horton* (1995) 11 Cal.4th 1068, 1114–1116 provides support for our conclusion. Horton was convicted of killing the illegal drug dealer from whom he bought drugs. The killing was preceded by 10 to 12 hours of drug consumption by Horton and some friends. When the supply of illegal drugs was depleted, Horton suggested robbing his dealer. One of his friends, Donald McLaurin, agreed to assist Horton by driving Horton to the dealer. The plans were abandoned when McLaurin was unable to borrow a vehicle. The following day, Horton murdered his dealer and stole his drug supply. McLaurin shared in the proceeds of the robbery, and ultimately drove Horton to the bus station so Horton could leave town. (*Ibid.*)

The trial court concluded that McLaurin was not an accomplice and refused to give accomplice instructions. The Supreme Court found no error. (*People v. Horton*, *supra*, 11 Cal.4th at p. 1115.) "McLaurin's mere initial agreement to drive defendant to the dealer's apartment *the prior evening*, an arrangement that never was carried out, did not constitute evidence of McLaurin's having planned, encouraged, or instigated the commission of a robbery or any other crime committed by defendant at a future time. McLaurin's objective apparently was to obtain more drugs on the evening of October 10, but the plan to do so was aborted. His knowledge that a crime might be committed by defendant in the future did not amount to aiding and abetting the commission of that prospective crime. [Citations.] Although the evidence of his conduct subsequent to the commission of the crimes might well have implicated McLaurin as an accessory, his status as accessory would not subject him to accomplice liability." (*Id.* at pp. 1115–1116.)

The decisions of Baca and Ramirez to leave the parking lot after the shooting and meet at defendant's home is comparable to the conduct of McLaurin. Although Baca and Ramirez did not directly participate in the murder, they both accompanied defendant at his home after the shooting occurred. Baca threw defendant's firearm as police officers arrived with knowledge that he left the scene of a shooting, and Ramirez jumped into

16.

defendant's vehicle at the Red Zone parking lot with a belief that a firearm was discharged from the vehicle. But, as the Supreme Court recognized, this would elevate them to accessory status at most, not subject them to accomplice liability. Because the evidence was insufficient as a matter of law to support a finding that Baca and Ramirez were accomplices, the court's failure to give CALCRIM No. 334 was not instructional error.

## III. Instruction Regarding Lack of Prosecution (CALCRIM No. 373)

Defendant next contends the court erroneously instructed the jury with CALCRIM No. 373, not to speculate about the absence of unjoined perpetrators. Defendant argues the instruction violated his due process rights because it prevented the jury from speculating why Baca and Ramirez were not being prosecuted for their purported involvement in the murder.

### A. *Background*

The trial court instructed the jury pursuant to CALCRIM No. 373 as follows:

> "The evidence shows that other persons may have been involved in the commission of the crime charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a co-defendant in this particular trial. You must not speculate about whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime charged."

Defendant's trial counsel objected to CALCRIM No. 373 as a "pinpoint instruction" that vouches for the prosecution and "creates a sense that [defendant] must be guilty." The prosecution responded that the jury would likely question the reasons that Baca was not being charged for throwing the gun. The trial court decided to give the instruction because "there were several witnesses here who certainly left this jury wondering what they were doing because of the behavior in the courtroom in terms of the way they dealt with questions .…"

17.

**B.** *Applicable Law*

As stated previously, " ' "the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 987.) Accordingly, "[i]n assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

**C.** *Analysis*

Defendant argues the instruction "had the prejudicial effect of dissuading the jury from considering the strong possibility that Ramirez and Baca were inculpating [defendant] in order to take blame away from themselves, in violation of state law and the federal Constitution." He is correct that the instruction should not apply to witnesses that may have been involved in the crime charged. The bench notes to CALCRIM No. 373 states: "If other alleged participants in the crime are testifying, this instruction should not be given or the bracketed portion should be given exempting the testimony of those witnesses." (Bench Notes to CALCRIM No. 373 (2020), p. 139.) The bracketed portion in the instruction reads: "[This instruction does not apply to the testimony of <insert names of testifying coparticipants>.]" (CALCRIM No. 373.)

However, the next sentence in the bench notes reads: "It is not error to give the first paragraph of this instruction if a reasonable juror would understand from all the instructions that evidence of criminal activity by a witness not being prosecuted in the current trial should be considered in assessing the witness's credibility." (Bench Notes to CALCRIM No. 373, *supra*, at p. 139.) To support this statement, the bench notes cite this court's decision in *People v. Fonseca* (2003) 105 Cal.App.4th 543, 549–550 (*Fonseca*).

18.

In *Fonseca*, this court addressed the propriety of giving CALJIC No. 2.11.5 when coparticipants were testifying witnesses. The version of CALJIC No. 2.11.5 the *Fonseca* court addressed read:

> " 'There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial. [¶] There may be many reasons why that person is not here on trial. Therefore, do not *discuss or give any consideration* as to why the other person is not being prosecuted in this trial or whether [he] [she] has been or will be prosecuted. Your [sole] duty is to decide whether the People have proved the guilt of [each] [the] defendant on trial.' " (*Fonseca*, *supra*, 105 Cal.App.4th at p. 548.)

The *Fonseca* court explained that "the potentially prejudicial effect of this instruction in the context of the testifying, unjoined coperpetrator lies not in the instruction itself, but in the rather remote possibility that the trial court would fail to give otherwise pertinent and required instructions on the issue of witness credibility. [Citations.] There is no error in giving CALJIC No. 2.11.5 so long as a reasonable juror, considering the whole of his or her charge, would understand that evidence of criminal activity by a witness not being prosecuted in the current trial should be considered in assessing the witness's credibility." (*Fonseca*, *supra*, 105 Cal.App.4th at pp. 549–550.)

Ultimately, the *Fonseca* court held that the instruction at issue "sufficiently conveys the idea that the intent is only to prohibit idle speculation, not to prevent consideration of pertinent evidence." (*Fonseca*, *supra*, 105 Cal.App.4th at p. 550.) It concluded that the giving of CALJIC No. 2.11.5 was not error when given in a trial where an unjoined coperpetrator testifies. (*Fonseca*, at p. 550.) Shortly after *Fonseca* was decided, the California Supreme Court came to the same conclusion, finding that giving CALJIC No. 2.11.5 was "not error when it is given together with other instructions that assist the jury in assessing the credibility of witnesses." (*People v. Crew* (2003) 31 Cal.4th 822, 845.) As the People observe, similar circumstances were also present in *People v. Johnsen*, *supra*, 10 Cal.5th at pages 1157–1158, which concluded

that a defendant's claim that instruction on lack of coparticipant prosecution lacked merit where "the jury received other instructions to assist them in evaluating [witnesses'] credibility as a nonprosecuted coparticipant."

The jury was instructed they could consider "anything that reasonably tends to prove or disprove the truth or accuracy of that testimony," including whether the testimony was influenced by bias or prejudice or a personal interest in how the case is decided, whether the witness made a statement inconsistent with his or her testimony, and whether the witness was promised immunity or leniency in exchange for his or her testimony. (CALCRIM No. 226.) The jury was also instructed that they must pay careful attention to all the instructions and consider them together. (CALCRIM No. 200.) Defendant's trial counsel also attacked the motivations for the testimony of Ramirez and Baca by asserting "Ramirez had every reason in the world to lie because he doesn't want to be prosecuted for murder and we know that Mr. Baca has every reason to lie because he doesn't want to be prosecuted for murder."

While CALCRIM No. 373 is a general instruction that tells the jurors not to speculate as to why potential participants are not being prosecuted, the instructions on how to evaluate witness testimony are specific. The specificity of the application of the witness testimony instructions would have made clear to the jury they could consider Baca and Ramirez's possible involvement with the crime in relation to their credibility. It is highly unlikely that, after reading and considering the instructions together, the jurors would have understood CALCRIM No. 373 as instructing them to disregard elements of how to evaluate witness testimony. Furthermore, the instruction did not tell the jury that it could not consider evidence that someone else committed the charged offense, it merely instructed the jury not to speculate on why other persons may not be jointly prosecuted. We find the jury would have known, based on the totality of the instructions, they could consider why a witness was not being prosecuted in determining credibility.

20.

In sum, we acknowledge the trial court should have expressly excluded Baca and Ramirez from the scope of CALCRIM No. 373. In light of the other instructions given on witness credibility, however, we find no reasonable likelihood jurors were misled in terms of their consideration of the testimony of those witnesses. Furthermore, if considered under the *Chapman v. California* (1967) 386 U.S. 18 or the *People v. Watson* (1956) 46 Cal.2d 818 standard for harmless error, "defendant cannot have been prejudiced." (*People v. Carrera* (1989) 49 Cal.3d 291, 313.) For the foregoing reasons, we find no error in the trial court's instructing the jury with CALCRIM No. 373. Accordingly, we also find none of appellant's constitutional rights have been violated.

## IV.     Instruction on Flight (CALCRIM No. 372)

Defendant's final contention is that the trial court erred by instructing the jury that it could use evidence of his flight to show a consciousness of guilt, pursuant to CALCRIM No. 372. Defendant argues that the instruction was in error because the prosecution did not rely on the defendant's flight to prove guilt, there was no basis to determine that defendant's consciousness of guilt was directed to the charged offense, and it was an unconstitutional pinpoint instruction that lessened the prosecution's burden of proof. Defendant alternatively argues that his trial counsel provided ineffective assistance of counsel by failing to request a modification of the instruction to "counteract the prosecution-favoring effect of the instruction."

### A.     *Background*

Toledo and Narvaez testified that they witnessed the shooter return to their vehicle after firing the shots that hit the victim. Multiple witnesses observed the shooter's vehicle leave the parking lot immediately after the shooting. In closing argument, the prosecution summarized Narvaez's testimony regarding the aftermath of the shooting by describing how "after the shots were fired, [the shooter] went back to the car, and fled." The prosecutor also referenced Orozco's testimony that "the shooter was standing outside of the driver door of the gray Jeep, got back in after the shooting, and then drove off."

21.

Defendant's trial counsel objected to CALCRIM No. 372 because he argued it was a pinpoint instruction violating defendant's due process rights. The trial court indicated that it would provide the instruction, but it agreed with the request of defendant's counsel to modify the instruction by omitting bracketed language that defendant either "tried to flee" or fled "after he was accused of committing a crime". The trial court instructed the jury pursuant to CALCRIM No. 372 as follows: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

### B.    *Applicable Law*

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

"Penal Code section 1127c requires that whenever evidence of flight is relied on to show guilt, the court must instruct the jury that while flight is not sufficient to establish guilt, it is a fact which, if proved, the jury may consider. This statute was enacted to abolish the common law rule that the jury could not be instructed on flight unless there was evidence defendant knew he had been accused." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243.) " 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' " (*People v. Bonilla* (2007)

41 Cal.4th 313, 328.)  The prosecution is not required to "prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury could find the defendant fled and permissibly infer a consciousness of guilt from the evidence."  (*Ibid*.)  The facts of each case determine whether it is reasonable to infer that flight shows a consciousness of guilt. (*People v. Mason* (1991) 52 Cal.3d 909, 941.)

Our Supreme Court in *People v. Mason*, *supra*, 52 Cal.3d 909, held that a flight instruction was proper where the defendant was charged with five murders all committed on separate dates.  Approximately four weeks after, but in the same vicinity of, one of the murders, the defendant led law enforcement on a high-speed automobile chase but eventually escaped on foot.  The pursuing deputies were able to see the defendant's face and found a work order in his abandoned vehicle bearing his first initial and last name, along with his parents' address.  The defendant was arrested the following month.  (*Id*. at pp. 924–925.)  To show consciousness of guilt, the trial court admitted evidence of the defendant's high-speed flight from law enforcement, and it instructed the jury pursuant to section 1127c.  (*Id*. at p. 941.)  Although the defendant in *Mason* argued the flight was so remote from the charged offense that it " 'was of marginal probative value, if any,' " the court disagreed, stating, "Common sense … suggests that a guilty person does not lose the desire to avoid apprehension for offenses as grave as multiple murders after only a few weeks."  (*Ibid*.)

### C.    *Analysis*

In the present case, the prosecution's evidence that defendant fled the scene in his vehicle after shooting the victim, rationally supported an inference that he was conscious of his guilt.  (*People v. Cage* (2015) 62 Cal.4th 256, 285; see *People v. Bonilla*, *supra*, 41 Cal.4th at p. 329.)  The prosecution may not have emphasized defendant's flight of the scene to specifically argue that it proved his guilt; however, defendant's "departure and the circumstances thereof were consistent with and supported the prosecution's theory" that he was the shooter and did not want law enforcement to apprehend him.  (*People v.*

*Bonilla*, at p. 329.) Sufficient evidence supported giving the flight instruction. (*People v. Cage*, 62 Cal.4th at p. 285.) Therefore, it was appropriate for the trial court to instruct the jury on flight.

Defendant's reliance on the case of *People v. Tuggles* (2009) 179 Cal.App.4th 339 in support of his position that the instruction was in error is misplaced. In *Tuggles*, the defendants argued that the trial court erred in failing to instruct the jury on flight. (*Id*. at p. 367.) The appellate court rejected the defendants' argument that an instruction was required because the prosecution introduced testimony that the defendants' left the scene after a shooting. (*Ibid*.) It concluded that it is the prosecution's reliance on evidence that a defendant fled that requires the instruction as opposed to the mere introduction of such evidence. (*Ibid*.) In the present case, the prosecution explicitly referenced defendant's flight from the crime scene during its closing argument. Thus, the prosecution's reliance on the evidence of defendant's flight required the trial court to instruct the jury regarding flight.

Next, we reject defendant's contention that the flight instruction is an unconstitutional pinpoint instruction that lessened the prosecutions' burden of proof. Defendant primarily relies on *People v. Wright* (1988) 45 Cal.3d 1126, a case that does not consider a consciousness of guilt instruction but rather a pinpoint instruction about a witness's ability to identify a person. He argues that *Wright* held an instruction highlighted a fact and suggested a way it could be read favorably to the prosecution. However, we note that the *Wright* court rejected a defendant's argument that the trial court was required to give a number of pinpoint instructions that were favorable to the defense. (See *id*. at pp. 1134–1135.)

"CALCRIM No. 372 does not focus on certain evidence and direct the jury how to consider the evidence. Rather, while informing the jury that it can infer guilt from flight, it both leaves it 'up to you [the jury] to decide the meaning and importance of that conduct' and further, limits the use of flight evidence by providing that it is not alone

24.

sufficient to prove guilt." (*People v. Price* (2017) 8 Cal.App.5th 409, 458; see also *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1159 [CALCRIM No. 372 does not "impermissibly lower[] the prosecution's burden of proof"].)

Defendant's argument that CALCRIM No. 372 "suggested an inference of guilt that the jury could draw," thereby violating due process, was rejected by the Supreme Court in *People v. Mendoza* (2000) 24 Cal.4th 130, superseded by statute on another ground as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 62–63 and footnote 8. As the *Mendoza* court stated: "The due process clauses of the federal Constitution (U.S. Const., 5th & 14th Amends.) require a relationship between the permissively inferred fact and the proven fact on which it depends.… [¶] ' … A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved.… A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.' " (*People v. Mendoza*, 24 Cal.4th at p. 180, citations omitted.) The court concluded that "permit[ting] a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a consciousness of guilt" does not violate due process. (*Ibid*.) Although the *Mendoza* court was addressing CALCRIM's predecessor, CALJIC No. 2.52, its holding applies equally to CALCRIM No. 372. Both instructions allow the jury to make a permissive inference, if it chooses, that the evidence of flight indicates a defendant's awareness of his guilt.

Even if instructional error occurred, defendant cannot establish prejudice. CALCRIM No. 372 did not presuppose the existence of flight; it left it up to the jury to determine whether defendant's conduct constituted flight, and if so, the weight it was entitled to. There was ample evidence, other than flight, tying defendant to the murder. Furthermore, the "cautionary nature" of the instruction "benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be

considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.) At worst, the instruction " 'was superfluous.' " (*Id*. at p. 1225.) Based on this record, any error in the giving of CALCRIM No. 372 was harmless beyond a reasonable doubt. We reject defendant's claim to the contrary.

In the alternative, defendant claims his trial counsel was ineffective for failing to request a modification of the flight instruction. " ' " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653.)

" '[A]n appellate court's ability to determine from the record whether an attorney has provided constitutionally deficient legal representation is in the usual case severely hampered by the absence of an explanation of an attorney's strategy.' [Citation.] For this reason, we long ago adopted the rule that ' "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." ' " (*People v. Johnson*, *supra*, 62 Cal.App.4th at p. 653.)

Defendant argues that his trial counsel should have "requested language to the effect that, if the jury had a reasonable doubt that [defendant]'s flight was due not to consciousness of his own guilt but to someone else's guilt, the jury could not use the flight as circumstantial evidence of [defendant]'s guilt of murder." We disagree.

The sole benefit defendant would have received from the proposed instruction is that the jury would have been expressly told they could infer another person's guilt from their flight. This benefit is of arguable value because " '[t]he logic of the inference' that … flight could also indicate consciousness of guilt on the part of third parties would have

been 'plain' to jurors, even in the absence of instruction to that effect." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1224.)  Such a marginal benefit would have also come at a cost because CALCRIM No. 372 is not entirely favorable to the party hoping the jury makes an inference of guilt from the fact of flight.  While the instruction permits such an inference, it also makes clear the jury need not accept the inference of guilt and expressly prohibits a conclusion of guilt based on flight alone.

Defendant's trial counsel could have reasonably concluded:  (1) that the jury would have been aware of the guilt-from-flight inference even in the absence of instruction; (2) that it was not worth reminding the jury that there are other, nonincriminating inferences to be drawn from flight; and (3) that it was not worth suggesting to the jury that they could not conclude another person was the shooter merely because they fled.  Because there is a conceivable strategic reason for counsel to not request modification of CALCRIM No. 372 to include another person, we reject defendant's claim of ineffective assistance of counsel.

## V.     No Cumulative Error

Defendant contends there was cumulative error.  To the extent there are instances where we assumed the existence of error, no prejudice resulted.  "The same conclusion is appropriate after considering their cumulative effect." (*People v. Valdez* (2012) 55 Cal.4th 82, 181.)  Similarly, the cumulative effect of any errors in this case was not prejudicial.

**DISPOSITION**

The judgment is affirmed.

POOCHIGIAN, ACTING P. J.

WE CONCUR:

DETJEN, J.

DE SANTOS, J.